Joseph W. Cotchett (SBN 36324)
Adam J. Zapala (SBN 245748)
Elizabeth T. Castillo (SBN 280502)
Christian S. Ruano (SBN 352012)
Lauren Devens (SBN 364511)
**COTCHETT, PITRE & MCCARTHY LLP**
840 Malcolm Road
Burlingame, CA 94010
Phone: (650) 697-6000
jcotchett@cpmlegal.com
azapala@cpmlegal.com
ecastillo@cpmlegal.com
cruano@cpmlegal.com
ldevens@cpmlegal.com

*Attorneys for Plaintiff Atlantic Coast Container, Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Atlantic Coast Container, Inc. and all others similarly situated,<br><br>Direct Purchaser Plaintiffs,<br><br>v.<br><br>China International Marine Containers Co., Ltd.,<br>CIMC USA, Inc.,<br>CXIC Group Containers Co. Ltd.,<br>Shanghai Universal Logistics Equipment Co., Ltd.,<br>Singamas Container Holdings Ltd., and<br>DOES 1-2,<br><br>Defendants. | Civil Action No.:<br><br>**DIRECT PURCHASER PLAINTIFF CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS

Page No.


I. INTRODUCTION ........ 1

II. PARTIES ........ 5

A. Plaintiff Atlantic Coast Container, Inc. ........ 5

B. Defendants ........ 5

C. Unnamed Defendants and Co-Conspirators ........ 8

III. JURISDICTION AND VENUE ........ 9

IV. FACTUAL ALLEGATIONS ........ 10

A. Standard Dry Shipping Containers Are Essential to Global Commerce ........ 10

1. The Development of Containerized Shipping ........ 10
2. The Critical Role of Standard Dry Shipping Containers ........ 14
3. Container Availability Is Critical for Supply Chains ........ 15

B. The Structure and Characteristics of the Dry Shipping Container Market Rendered It Highly Susceptible to Collusion ........ 16

C. COVID-19 Created Extraordinary Demand for Shipping Containers and Increased the Importance of Container Supply ........ 19

D. Defendants and Their Co-Conspirators Entered into An Illegal Agreement to Restrict Output and Fix Prices of Dry Shipping Containers ........ 22

E. Defendants Implemented, Monitored, and Enforced the Conspiracy ........ 24

F. Defendants Concealed Their Unlawful Conduct ........ 27

G. Defendants' Conspiracy Artificially Increased Container Prices and Generated Extraordinary Profits ........ 29

H. Government Investigation and Criminal Proceedings ........ 30

I. Relevant Distribution Chain ........ 31

J. Potential Damages ........ 31

V. STATUTES OF LIMITATIONS ........ 31

VI. CLASS ALLEGATIONS ........ 32

VII. CLAIMS FOR RELIEF ........ 34

VIII. PRAYER FOR RELIEF ........ 36

IX. JURY DEMAND ........ 36

Direct Purchaser Plaintiff, Atlantic Coast Container, Inc., on behalf of itself and all others similarly situated, brings this Class Action Complaint ("Complaint") for damages and for equitable and injunctive relief against Defendants. Plaintiff makes the following allegations based on knowledge as to its own actions, facts and circumstances, and upon information and belief and the reasonable investigation of counsel as to all other matters.

## I. INTRODUCTION

1. "[T]he standard container has all the romance of a tin can."[1] The highly pragmatic shipping container nevertheless holds its value "not in what it is, but in how it is used."[2] Its value is found in its role as "the core of a highly automated system for moving goods from anywhere, to anywhere, with a minimum of cost and complication on the way."[3]

2. Shipping containers are effectively among the most important pieces of infrastructure in the modern global economy: "[a]lthough only a simple metal box, it has transformed global trade."[4] Approximately "90 percent of the world's goods are transported by sea, with 60 percent of that . . . packed in large steel containers."[5] They serve as the principal means by which goods move through international supply chains, enabling cargo to be transported seamlessly between ocean vessels, rail systems, trucking networks, warehouses, distribution centers, manufacturers, and retailers. Virtually every sector of the economy depends on the availability of standard dry shipping containers – fully enclosed, weather-resistant steel intermodal containers – to move goods efficiently and reliably through domestic and international commerce. Astoundingly, "$14 trillion of the world's goods spend some time inside a big metal box."[6]

3. The standardization of shipping containers revolutionized global trade by dramatically reducing transportation costs, increasing efficiency, and facilitating the rapid

[1] Levinson, Marc, *The Box: How the Shipping Container Made the World Smaller and the World Economy Bigger* at 2, Princeton University Press (2d ed. 2016).
[2] *Id.*
[3] *Id.*
[4] https://www.economist.com/finance-and-economics/2013/05/18/the-humble-hero
[5] https://maritime-executive.com/editorials/a-brief-history-of-the-shipping-container
[6] https://www.portoflittlerock.com/2024/06/the-shipping-container-an-economic-revolutionizer/

movement of goods around the world.[7] Standard dry shipping containers consequently have become indispensable to international commerce, and demand for such containers directly affects shipping lines, logistics providers, container leasing companies, importers, exporters, manufacturers, retailers, and countless other businesses operating throughout the United States.

4. From at least November 1, 2019 through December 31, 2024 ("Class Period"), the market for standard dry shipping containers was extraordinarily concentrated. Defendants and their Co-Conspirators (defined *infra*) collectively controlled approximately 95 percent of global production capacity for standard dry shipping containers.[8] The overwhelming majority of the world's shipping container manufacturing capacity was concentrated in China and controlled by a small group of manufacturers, including Defendants and Co-Conspirators, that sold containers throughout the United States and the world.[9]

5. The extraordinary concentration of the standard dry shipping container industry did not arise by chance. For decades, container manufacturing capacity became increasingly consolidated among a small group of Chinese manufacturers that benefited from industrial planning initiatives, favorable financing, and access to critical inputs.[10] Chinese manufacturers have come to dominate global container production, resulting in a market in which a handful of firms control virtually all worldwide manufacturing capacity.[11] By the beginning of the Class Period, Defendants and their Co-Conspirators occupied a uniquely powerful position in the dry shipping container market, possessing the ability to influence global output, supply, and pricing for standard dry shipping containers.

---

[7] Carl W. Bentzel, *Assessment of P.R.C. Control of Container and Intermodal Chassis Manufacturing* at 5, Report of Commissioner Carl W. Bentzel (2022), https://www.fmc.gov/wp-content/uploads/2022/03/ContainerandChassisManufacturingFinalReport.pdf.

[8] *Supra*, note 7, at 8.

[9] *Supra*, note 7, at 3, 8, 9, 20, 24.

[10] *Supra*, note 7, at 5 ("the manufacturing of maritime containers and intermodal chassis is entrenched in China with the aid and direction of the Chinese government."); *id.* at 9 ("China early in the development of intermodalism in the 1970s . . . developed policies supported by the government to aggressively pursue control of maritime assets, and they have achieved worldwide market dominance.").

[11] *Supra*, note 7, at 3, 8, 9, 20, 24.

6. This concentration created a market highly susceptible to collusion. Significant barriers to entry—including the need for specialized manufacturing facilities, substantial capital investment, access to steel and other raw materials, established relationships with major customers like shipping lines, logistic companies, and container lessors, and compliance with international technical standards—prevented new competitors from rapidly entering the market or expanding production in response to rising prices.

7. The structure of the dry shipping container market facilitated collusion among the Defendants and Co-Conspirators. In a competitive marketplace, manufacturers would ordinarily compete to increase output, lower costs, improve efficiency, and capture market share. In this market, however, Defendants and their Co-Conspirators chose a different path: they agreed to collectively restrict supply and eliminate meaningful competition among themselves, all for the purpose of increases prices and achieving supracompetitive profits. Part of this *per se* illegal agreement was even memorialized in a writing entitled "Shenzhen Moon Gazing Equity Investment Fund" ("Moon Gazing Fund"), which provides direct evidence of Defendants' conspiracy.

8. During the Class Period, Defendants and their Co-Conspirators engaged in a coordinated conspiracy to suppress output and maintain supracompetitive prices for standard dry shipping containers. Through this unlawful agreement, Defendants restrained competition in one of the most concentrated industrial markets in the world and deprived purchasers of the benefits of a competitive marketplace.

9. The conspiracy occurred during a period of extraordinary disruption in global commerce. As the COVID-19 pandemic spread throughout the world, international supply chains experienced unprecedented strain. Demand for dry shipping containers increased dramatically, transportation networks became congested, and the availability of shipping containers became a critical factor affecting the movement of goods worldwide.[12]

10. During the pandemic, dry shipping containers became increasingly scarce, and container prices rose dramatically. Industry observers publicly questioned whether shipping

[12] *Supra*, note 7, at 6 ("This new pent-up demand for retail imports, combined with the increased volumes of cargoes to respond to COVID-19, generated a cargo boom.").

container manufacturers were failing to expand production despite unprecedented demand and whether market concentration within the industry was contributing to container shortages and escalating prices.[13] While businesses throughout the United States struggled to secure shipping containers necessary to move goods, Defendants and their Co-Conspirators possessed the ability to influence the global supply of containers and the prices they charged to purchasers.

11. Defendants' conduct had foreseeable and far-reaching consequences. Because standard dry shipping containers are an essential input in international transportation and logistics, artificial restrictions on container supply increased costs to purchasers of containers, like Plaintiff.[14]

12. Defendants' conspiracy had the intended effect of reducing the supply of dry shipping containers and raising their prices. During the Class Period, prices for standard dry shipping containers increased dramatically, reaching levels far above those that would have prevailed in a competitive market. At the same time, Defendants reported substantial increases in revenues, margins, and profitability attributable to container manufacturing operations.

13. The United States Department of Justice ("DOJ") has charged Defendants and senior executives of Defendants with participating in a criminal conspiracy affecting more than $35 billion in commerce globally.[15] The criminal charges describe a coordinated effort among manufacturers controlling approximately 95 percent of worldwide container production capacity to restrict output and fix prices for standard dry shipping containers sold throughout the United States and around the world.[16]

14. Plaintiff and members of the proposed Class (*defined infra*) directly purchased standard dry shipping containers from at least one Defendant or its Co-Conspirators during the Class Period. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Class

[13] *Supra*, note 7, at 3 ("When demand for ocean containers increased, Chinese-based intermodal equipment manufacturers were notably slow in ramping up production, raising the question of whether this was part of a deliberate strategy to manipulate prices.")

[14] *Supra*, note 7, at 5 ("If container flow is hindered by congestion or disruption, it slows the velocity of the supply chain."); *id.* at 24 ("The current supply chain disruption provides illumination on the larger issues related to monopolistic control of critical elements needed to facilitate international trade in containers.").

[15] *United States of America v. China International Marine Containers (Group) Co., LTD., et al.*, No. 25-CR-0311-YGR (Oct. 10, 2025) Dkt. Nos. 1, 10.

[16] *Id.*

members paid artificially inflated and supracompetitive prices for standard dry shipping containers and suffered injury to their business and property.

15. Plaintiff brings this action pursuant to Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act to recover treble damages, obtain injunctive relief, and restore the competitive conditions that Defendants unlawfully destroyed.

## II. PARTIES

### A. Plaintiff Atlantic Coast Container, Inc.

16. Plaintiff Atlantic Coast Container, Inc. is a South Carolina corporation that maintained its principal place of business in Greenville, South Carolina, throughout the Class Period. During the Class Period, Plaintiff directly purchased standard dry shipping containers from at least one Defendant for use in its business operations. Plaintiff Atlantic Coast Container, Inc. paid supracompetitive prices for the containers that it directly purchased from Defendants during the Class Period.

17. Defendants' conspiracy to restrict output and fix, raise, stabilize, and maintain prices for standard dry shipping containers directly affected the prices paid by Plaintiff for such containers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff paid artificially inflated and supracompetitive prices for standard dry shipping containers purchased from Defendants and their Co-Conspirators and thereby suffered antitrust injury to its business and property.

18. Plaintiff brings this action individually and on behalf of all other similarly situated persons and entities that directly purchased standard dry shipping containers from Defendants or their Co-Conspirators during the Class Period.

### B. Defendants

19. Defendant China International Marine Containers (Group) Co., Ltd. is a corporation organized and existing under the laws of the People's Republic of China with its principal place of business in Shenzhen, Guangdong Province, China. During the Class Period, China International Marine Containers (Group) Co., Ltd. was the world's largest manufacturer of standard dry shipping containers and one of the dominant participants in the global container manufacturing industry. China International Marine Containers (Group) Co., Ltd. manufactured, marketed, distributed, and

sold standard dry shipping containers throughout the United States and worldwide. Together with Defendants and their Co-Conspirators, China International Marine Containers (Group) Co., Ltd. controlled a substantial share of global container manufacturing capacity and participated in the conspiracy alleged herein.

20. Defendant CIMC USA, Inc. ("CIMC USA") is a corporation organized and existing under the laws of Delaware, with its principal place of business at 289 East Water Tower Drive, Monon, Indiana 47969. CIMC USA is a subsidiary of China International Marine Containers (Group) Co., Ltd.. CIMC USA is registered to do business in California (Entity No. 3578907) and has designated CSC – Lawyers Incorporating Service as its agent for service of process in California. During the Class Period, CIMC USA served as a principal vehicle through which China International Marine Containers (Group) Co., Ltd. marketed, distributed, and sold standard dry shipping containers to customers in the United States, CIMC USA participated in and furthered the unlawful conduct alleged herein through acts undertaken on behalf of China International Marine Containers (Group) Co., Ltd. in connection with the marketing, distribution, and sale of standard dry shipping containers in the United States.

21. Defendants China International Marine Containers (Group) Co., Ltd. and CIMC USA are collectively referred to herein as "CIMC."

22. Defendant Shanghai Universal Logistics Equipment Co., Ltd., also known as Dong Fang International Containers ("Dong Fang"), is a corporation organized and existing under the laws of the People's Republic of China with its principal place of business in Shanghai, China. During the Class Period, Dong Fang was a significant participant in the global standard dry shipping container industry. Dong Fang manufactured, marketed, distributed, and sold standard dry shipping containers throughout the United States and worldwide. Together with Defendants and their Co-Conspirators, Dong Fang controlled a substantial share of global container manufacturing capacity and participated in the conspiracy alleged herein.

23. Defendant CXIC Group Containers Co. Ltd. ("CXIC") is a corporation organized and existing under the laws of the People's Republic of China with its principal place of business in the People's Republic of China. During the Class Period, CXIC was a significant participant in the

global standard dry shipping container industry. CXIC manufactured, marketed, distributed, and sold standard dry shipping containers throughout the United States and worldwide. Together with Defendants and their Co-Conspirators, CXIC controlled a substantial share of global container manufacturing capacity and participated in the conspiracy alleged herein.

24. Defendant Singamas Container Holdings Ltd. ("Singamas") is a corporation organized and existing under the laws of Hong Kong with its principal place of business in Hong Kong, China. During the Class Period, Singamas was a significant participant in the global standard dry shipping container industry. Singamas manufactured, marketed, distributed, and sold standard dry shipping containers throughout the United States and worldwide. Together with Defendants and their Co-Conspirators, Singamas controlled a substantial share of global container manufacturing capacity and participated in the conspiracy alleged herein.

25. During the Class Period, Defendants and their Co-Conspirators collectively controlled approximately 95 percent of worldwide production capacity for standard dry shipping containers. The market for standard dry shipping containers was highly concentrated, with a small number of manufacturers accounting for virtually all global production. Defendants sold containers to shipping lines, container leasing companies, logistics providers, importers, exporters, retailers, and other commercial purchasers throughout the United States and worldwide.

26. During the Class Period, Defendants regularly manufactured, marketed, sold, and imported standard dry shipping containers for delivery to purchasers in the United States, Defendants sold substantial quantities of standard dry shipping containers in United States import commerce to customers located throughout the United States, including shipping lines, container lessors, logistics providers, transportation companies, retailers, manufacturers, and other commercial purchasers. Defendants derived substantial revenues from sales of standard dry shipping containers imported into and sold within the United States.

27. Whenever reference is made in this Complaint to any act, deed, or transaction of any Defendant, the allegation means that the Defendant engaged in the act, deed, or transaction by or through its officers, directors, employees, agents, subsidiaries, affiliates, or other representatives

while they were actively engaged in the management, direction, control, or transaction of the Defendant's business affairs.

28. In addition to Defendants, various other companies and individuals, including container manufacturers and senior executives not named as Defendants herein, participated as Co-Conspirators in the unlawful conduct alleged in this Complaint and performed acts in furtherance of the conspiracy.

29. During the Class Period, Defendants sold substantial quantities of standard dry shipping containers in and into the United States, and derived substantial revenues from interstate and international commerce. Defendants' conduct substantially affected United States import commerce and domestic commerce generally.

30. Various subsidiaries, affiliates, and related entities of Defendants participated in, assisted with, facilitated, carried out, and/or otherwise knowingly furthered the unlawful conduct alleged herein.

### C. Unnamed Defendants and Co-Conspirators

31. Various other persons, firms, and corporations, some of whose identities are presently unknown to Plaintiffs, have participated as Co-Conspirators with Defendants in the conspiracy alleged herein. For example:

32. DOE 1 is Co-Conspirator Company A. Company A was a company organized and existing under the laws of the People's Republic of China. Company A was engaged in the business of manufacturing dry shipping containers and selling them to customers in the United States and elsewhere during the Class Period. Company A was a Co-Conspirator of Defendants in the conspiracy alleged herein.

33. DOE 2 is Co-Conspirator Company B. Co-Conspirator Company B was a company organized and existing under the laws of the People's Republic of China. Company B was engaged in the business of manufacturing dry shipping containers and selling them to customers in the United States and elsewhere during the Class Period. Company B was a Co-Conspirator of Defendants in the conspiracy alleged herein.

34. These unnamed entities and individuals performed acts and made statements in furtherance of the conspiracy, and Defendants are jointly and severally liable for the acts of all such Co-Conspirators, whether or not they are specifically named as defendants in this Complaint.

35. Plaintiff will seek leave to amend this Complaint to name these unnamed Co-Conspirators once their identities and precise roles become known through investigation and discovery.

## III. JURISDICTION AND VENUE

36. This action arises under Section 1 of the Sherman Act, 15 U.S.C. §§ 1 and 26, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

37. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, because this action arises under the antitrust laws of the United States and involves restraints of trade affecting interstate and foreign commerce.

38. This Court has personal jurisdiction over Defendants because, during the Class Period, Defendants transacted business throughout the United States, including in this District; purposefully directed their activities at the United States and this District; sold substantial quantities of standard dry shipping containers in and into the United States, including in this District; and committed acts in furtherance of the conspiracy alleged herein that were directed at and had a substantial intended effect on United States commerce, including commerce within this District. Defendants purposefully availed themselves of the benefits of United States commerce by regularly selling standard dry shipping containers to customers located in the United States and deriving substantial revenue from those sales.

39. Defendants manufactured, marketed, distributed, sold, and/or delivered substantial quantities of standard dry shipping containers to customers located throughout the United States, including customers in this District, and derived substantial revenue from interstate and international commerce.

40. Defendants' anticompetitive conduct was directed at and had a direct, substantial, and reasonably foreseeable effect on trade and commerce within the United States. Defendants

understood and intended that standard dry shipping containers manufactured and sold pursuant to the conspiracy would be purchased by customers operating in United States commerce and used to transport goods into, out of, and throughout the United States. The injuries suffered by Plaintiff and members of the Class arose directly from those domestic effects.

41. Venue is proper in this District pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391 because one or more Defendants transacted business, were found, had agents, or resided in this District, and because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

42. Venue is also proper because Defendants sold substantial quantities of standard dry shipping containers in and into this District, committed overt acts in furtherance of the conspiracy alleged herein, and directed anticompetitive conduct toward purchasers located in this District.

43. Venue is further proper because the conspiracy alleged herein has been the subject of parallel criminal proceedings brought in this District, including the indictment filed by the DOJ arising from the same unlawful conduct. On information and belief, the Honorable Yvonne Gonzalez-Rogers is presiding over the parallel criminal proceedings in this District.

## IV. <u>FACTUAL ALLEGATIONS</u>

### A. Standard Dry Shipping Containers Are Essential to Global Commerce

#### 1. The Development of Containerized Shipping

44. Before the development of standardized shipping containers, cargo transported by ocean vessel was typically loaded and unloaded manually in individual crates, sacks, barrels, and other forms of packaging.[17] Cargo of different shapes and sizes created logistical issues that necessitated "a game of maritime Tetris" in order to utilize the space in a vessel.[18] This "break bulk" method of shipping was labor-intensive, time-consuming, costly, and vulnerable to theft and damage; dock workers were said to earn "$20 a day and all the Scotch you could carry home."[19]

[17] https://oceanservice.noaa.gov/economy/shipping.html
[18] https://www.economist.com/finance-and-economics/2013/05/18/the-humble-hero
[19] *Id.*

Unsurprisingly, ships often spent more time in port loading and unloading cargo than transporting goods across the ocean.[20]

45. In 1956, American trucking entrepreneur Malcolm McLean introduced the first modern shipping container, creating a system that allowed cargo to remain in a single sealed container as it moved among the logistics network.[21] The benefits of Mr. McLean's invention were immediate - after tabulating the costs of his first container ship, "he found that it cost $0.16 per tonne to load compared with $5.83 per tonne for loose cargo."[22] The shipping container not only reduced costs, but also increased the efficiency in which cargo could be loaded: "in 1965 dock labour could move only 1.7 tonnes per hour onto a cargo ship; five years later they could load 30 tonnes in an hour."[23] As greater efficiencies were realized, Mr. McLean's simple innovation, dubbed *intermodalism*, "allowed products to be shipped around the world quickly, cheaply, and efficiently by using cargo containers that more easily fit on trucks, trains, and ships."[24]

46. In 1968, the shipping industry adopted standardized container dimensions, including the twenty-foot equivalent unit ("TEU") and forty-foot unit ("FEU").[25] These standardized containers became the foundation of modern containerized shipping and remain the most widely used shipping containers in global commerce. Standard dry shipping containers - commonly referred to as "dry containers" because they do not contain temperature-control systems - are designed to transport a wide variety of cargo, including consumer goods, industrial products, machinery, paper products, furniture, steel, and other freight.[26] Twenty-foot containers are generally used for heavier cargo, while forty-foot containers are designed to carry larger volumes of lighter cargo.[27] Today,

---

[20] https://oceanservice.noaa.gov/economy/shipping.html
[21] https://www.portoflittlerock.com/2024/06/the-shipping-container-an-economic-revolutionizer/
[22] https://www.economist.com/the-economist-explains/2013/05/21/why-have-containers-boosted-trade-so-much
[23] *Id.*
[24] https://oceanservice.noaa.gov/economy/shipping.html
[25] https://www.portoflittlerock.com/2024/06/the-shipping-container-an-economic-revolutionizer/
[26] https://www.maersk.com/logistics-explained/transportation-and-freight/2023/08/28/freight-container
[27] *Id.*

standard dry shipping containers "are the most common type of container in the world, with 90% of sea freight loaded into them."[28]

**FIGURE 1**




*Source:* https://www.maersk.com/logistics-explained/transportation-and-freight/2023/08/28/freight-container

47. Although standard dry shipping containers are the most common type of shipping container used in international commerce, other specialized containers exist for particular transportation needs. These include refrigerated containers designed to transport temperature-sensitive goods such as food products and flowers; controlled-atmosphere containers that regulate temperature and atmospheric conditions to preserve perishable cargo during long-distance transit; open-top containers used for cargo that exceeds standard height limitations; flat-rack and platform containers used to transport oversized machinery, construction materials, and other irregularly shaped cargo; and transportable tank containers designed to carry liquids.[29] Unlike these specialized containers, standard dry shipping containers are general-purpose commodity-type containers capable of transporting a wide variety of consumer and industrial goods and account for the overwhelming majority of containerized freight transported worldwide.

48. The standardization of shipping container dimensions has also dramatically increased the scale and efficiency of global shipping. Because standardized containers can be loaded, stacked,

[28] *Id.*
[29] *Id.*

and transported uniformly, shipping companies have been able to increase vessel capacity, size, and loading. As containerized shipping expanded, vessel sizes increased accordingly, and, in the past two decades alone, the average size of a container ship has doubled.[30] Standardization has similarly increased the efficiency of modern ports, which “can now move upwards of 70 containers per crane per hour.”[31] These developments further cemented the role of standardized shipping containers as a critical component of modern international commerce.

**FIGURE 2**




[30] https://www.portoflittlerock.com/2024/06/the-shipping-container-an-economic-revolutionizer/

[31] https://www.weforum.org/stories/2018/11/visualizing-global-shipping-container-traffic/

*Source:* https://www.mckinsey.com/~/media/mckinsey/industries/travel%20logistics%20and%20*infra*structure/our%20insights/how%20container%20shipping%20could%20reinvent%20itself%20for%20the%20digital%20age/container-shipping-the-next-50-years-103017.pdf

### 2. The Critical Role of Standard Dry Shipping Containers

49. As mentioned, standard dry shipping containers are used to transport goods throughout the global supply chain and enable cargo to be transported seamlessly among ocean vessels, rail systems, trucks, warehouses, and distribution centers without the need to unload and reload cargo at each stage of transportation.[32]

50. Today, standard dry shipping containers serve as the backbone of international commerce. At any given time, more than 20 million shipping containers are moving goods and commodities throughout the world, while modern container vessels are capable of carrying more than 20,000 TEUs on a single voyage.[33] Products ranging from consumer electronics, clothing, furniture, and household goods to industrial equipment, manufacturing inputs, food products, and medical supplies are routinely transported using standard dry shipping containers.

51. The speed, reliability, and predictability of containerized shipping have enabled businesses to develop increasingly sophisticated international supply chains. Manufacturers, retailers, wholesalers, and distributors rely upon standard dry shipping containers to transport raw materials, component parts, and finished goods across international markets.[34] The efficiencies created by containerized shipping have also facilitated just-in-time manufacturing and inventory-management systems, allowing businesses to reduce inventory costs, shorten delivery times, and source products and components from suppliers located throughout the world.[35]

52. As global supply chains have become increasingly interconnected, the importance of standard dry shipping containers has grown accordingly. Today, "all major ports are integrated into a global maritime transport system," with a widespread adoption of containerized transportation and

---

[32] *Supra*, note 7, at 4-5.
[33] https://www.portoflittlerock.com/2024/06/the-shipping-container-an-economic-revolutionizer/
[34] *Supra*, note 1, at 13-14.
[35] *Id.*

supporting logistics infrastructure.[36] These developments have enabled businesses to reach customers and suppliers across vast geographic distances and have made international trade an essential component of the modern global economy.[37]

53. The efficiency and sophistication of the modern containerized transportation network is perhaps best illustrated by the following example:

> The result of all this hectic activity is a nearly seamless system for shipping freight around the world. A 25-ton container of coffeemakers can leave a factory in Malaysia, be loaded aboard a ship, and cover the 9,000 miles to Los Angeles in 23 days. A day later, the container is on a unit train to Chicago, where it is transferred immediately to a truck headed for Cincinnati. The 11,000-mile trip from the factory gate to the Ohio warehouse can take as little as 28 days, a rate of 400 miles per day, at a cost lower than that of a single business-class airline ticket. More than likely, no one has touched the contents, or even opened the container, along the way.[38]

54. As eloquently exhibited above, standardized shipping containers permit goods to move efficiently among ocean vessels, rail systems, trucks, ports, and distribution centers with minimal handling and delay. The ability to transport cargo seamlessly through an integrated global transportation network has made standard dry shipping containers indispensable to modern international commerce.

### 3. Container Availability Is Critical for Supply Chains

55. Shipping lines, logistics companies, and container leasing companies collectively spend billions of dollars each year acquiring and maintaining fleets of standard dry shipping containers. The demand for such containers is directly linked to the volume of international trade and the movement of goods through global transportation networks.[39]

56. The availability of standard dry shipping containers plays a critical role in determining the efficiency and reliability of supply chains. When adequate supplies of containers are available, goods can move efficiently from manufacturers to distributors, retailers, and

---

[36] https://www.stlouisfed.org/on-the-economy/2020/december/role-innovations-global-trade-shipping-container

[37] *Supra*, note 1, at 13-14.

[38] *Supra*, note 1, at 9.

[39] Robert Harrison, Miguel A. Figliozzi, and C. Michael Walton, *Mega-Containerships and Mega-Containerports in the Gulf of Mexico: A Literature Review and Annotated Bibliography* at 27, University of Texas at Austin, Center for Transportation Research, ("As world trade increases and as more commodities are stuffed into containers, container demand at the shipper level increases.").

consumers. Conversely, shortages of containers can significantly disrupt commerce, delay shipments, increase transportation costs, and create bottlenecks throughout the supply chain.[40]

57. The importance of container availability became particularly evident during the COVID-19 pandemic, when disruptions in container flows, congestion at ports, and shortages of operational equipment contributed to significant delays throughout the global transportation system. Reductions in container availability impaired the movement of cargo worldwide and increased transportation costs for businesses dependent upon international trade.[41]

58. Because standard dry shipping containers are essential to the transportation of goods throughout the world economy, the market for their manufacture and sale affects a vast array of industries and commercial activities. Changes in container availability or pricing can have significant downstream effects on shipping costs, logistics operations, inventory management, and the ultimate cost of goods purchased by businesses and consumers.

59. Throughout the Class Period, standard dry shipping containers were indispensable to domestic and international commerce. Businesses operating in the United States relied upon a stable and competitively supplied market for containers to transport goods efficiently and meet customer demand. As alleged herein, Defendants' conduct distorted that market and deprived purchasers of the benefits of competition.

**B. The Structure and Characteristics of the Dry Shipping Container Market Rendered It Highly Susceptible to Collusion**

60. During the Class Period, the market for the manufacture and sale of standard dry shipping containers was extraordinarily concentrated. Defendants and their Co-Conspirators collectively manufactured approximately 95 percent of the world's standard dry shipping containers, giving a small group of manufacturers unprecedented control over global container production

[40] *Supra*, note 7, at 5 ("If container flow is hindered by congestion or disruption, it slows the velocity of the supply chain.").

[41] *Id.* at 8 ("The shortage of shipping containers is yet another symptom of the havoc the pandemic has brought on international supply chains. As a result, freight costs are rising, which in turn leads to higher prices for consumer goods.").

capacity.[42] A highly concentrated market is more susceptible to collusion and other anti-competitive practices.

61. The overwhelming majority of global container manufacturing capacity was (and is) concentrated in China, "particularly in cities like Shanghai, Shenzhen, and Qingdao."[43] Industry observers and government agencies recognized that Chinese manufacturers dominated worldwide production of standard dry shipping containers and that virtually all containers used in international commerce originated from a small number of Chinese-based manufacturers.[44]

62. During the Class Period, Defendants CIMC, Dong Fang, CXIC, and Singamas were among the largest container manufacturers in the world. Together with their Co-Conspirators, these manufacturers supplied containers to direct purchasers operating throughout the United States and worldwide.

63. Industry participants relied upon Defendants and their Co-Conspirators as principal suppliers of standard dry shipping containers. Because so few manufacturers controlled such a substantial portion of global production, purchasers often had limited alternatives when seeking to acquire new containers.

64. Significant barriers to entry prevented new competitors from meaningfully challenging Defendants' dominance. The manufacture of standard dry shipping containers requires substantial capital investment, specialized production facilities, access to steel and other raw materials, technical expertise, and compliance with internationally recognized specifications governing container design and performance.

65. New entrants also faced substantial commercial barriers. Major purchasers of shipping containers—including shipping lines, container leasing companies, and logistics providers— typically require suppliers capable of producing large quantities of containers meeting consistent quality and technical standards. Establishing such relationships and achieving sufficient production scale requires significant time and investment.

---

[42] *Id.* at 3.
[43] https://www.pier2pier.com/blog/how-shipping-containers-are-made/
[44] *Supra*, note 7 at 3, 8.

66. The highly concentrated nature of the market was reinforced by the consolidation of manufacturing capacity among a small number of firms. The world's container manufacturing base has become concentrated in China and only a handful of manufacturers possess the ability to supply containers on the scale required by global commerce.[45]

67. Moreover, leading Chinese container manufacturers have benefited from substantial governmental support and industrial policies that have facilitated the consolidation of container manufacturing capacity.[46] Such support contributed to the development of a market in which a small number of firms control virtually all global production.

68. The concentrated structure of the container manufacturing industry has increased the transparency of competitive conduct among manufacturers. Because only a small number of firms account for nearly all global production, manufacturers could readily monitor market conditions, production levels, and pricing trends throughout the industry.

69. Defendants control over the market for standard dry shipping containers was reinforced as the commodity is highly inelastic "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase. For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue. Demand for dry shipping containers is inelastic considering there are no close substitutes for these products. In addition, customers must purchase

---

[45] *Supra*, note 7 at 5 ("the manufacturing of maritime containers and intermodal chassis is entrenched in China with the aid and direction of the Chinese government.").

[46] *Supra*, note 7 at 9 ("China early in the development of intermodalism in the 1970s . . . developed policies supported by the government to aggressively pursue control of maritime assets, and they have achieved worldwide market dominance."), pg. 23 ("the challenge of competing with dominant producers who are receiving government subsidies is daunting.").

dry shipping containers as an essential part of transporting goods, even if the prices are kept at a supracompetitive level.

70. Defendants and Co-Conspirators attended industry events where they had the opportunity to meet, have improper discussions under the guise of legitimate business contacts, and perform acts necessary for the operation and furtherance of the conspiracy. For example, Defendants and Co-Conspirators maintained and used a trade association, the China Container Industry Association ("CCIA"), to promote, facilitate, police, monitor, and conceal the combination and conspiracy. Defendants and Co-Conspirators have also been involved with the National Portable Storage Association ("NPSA"), a trade group for businesses that rent, sell, or lease shipping containers, mobile offices, and portable storage trailers.

71. The market for standard dry shipping containers thus exhibited characteristics that made coordinated conduct more likely to succeed, including a limited number of major competitors, standardized products, substantial barriers to entry, concentrated production capacity, a customer base dependent upon reliable access to container supply, and ample opportunities to conspire.

72. Because of these market characteristics, Defendants and their Co-Conspirators possessed both the ability and the incentive to coordinate output and pricing decisions. The concentrated nature of the market substantially reduced competitive constraints and increased the likelihood that an agreement among manufacturers could successfully restrict supply and raise prices above competitive levels.

73. The market structure described above created conditions under which coordinated conduct could be effectively implemented, monitored, and enforced. As alleged below, Defendants exploited these conditions to organize and operate a conspiracy that restricted output and increased prices for standard dry shipping containers throughout the Class Period.

### C. COVID-19 Created Extraordinary Demand for Shipping Containers and Increased the Importance of Container Supply

74. Beginning in early 2020, the COVID-19 pandemic caused unprecedented disruptions to global supply chains, international transportation networks, and worldwide commerce.

Manufacturing slowdowns, labor shortages, transportation bottlenecks, and port congestion placed extraordinary pressure on the movement of goods throughout the world economy.[47]

75. In the early stages of the pandemic, manufacturing activity in numerous countries slowed significantly as governments implemented lockdowns and other public health measures. Ocean carriers responded by reducing service via fewer cruises and other operational adjustments, resulting in disruptions to the normal movement of shipping containers throughout global transportation networks.[48]

76. These disruptions contributed to significant imbalances in container availability. Containers became stranded in locations where they were no longer needed, while shortages emerged in regions experiencing increased demand.[49] The efficient circulation of containers throughout the global supply chain became increasingly difficult as transportation networks experienced congestion and delay.

77. As economies adapted to pandemic conditions, demand for imported goods increased dramatically. Growth in e-commerce, increased consumer spending on physical goods, and efforts by businesses to replenish inventories generated substantial demand for containerized shipping services and increased the need for additional shipping containers.[50]

78. At the same time, congestion at ports, rail facilities, warehouses, and distribution centers reduced the speed at which containers could be unloaded, repositioned, and returned to service.[51] Delays throughout the transportation network significantly reduced the number of voyages

---

[47] *Supra*, note 7 at 5-8.

[48] *Supra*, note 7 at 6 (“To stabilize operations, ocean carriers . . . reduced the number of vessels in service through cancellations (blanked sailings).”).

[49] *Id.* (“Not only did this disruption put the brakes on import and export movements, but it also meant empty containers were not picked up and re-positioned, and that other intermodal equipment was left stranded in locations without normal return practices being followed.”).

[50] *Id.* (“As countries addressed their COVID-19 recovery, it generated massive opportunity for pent-up demand in the United States for e-commerce retail consumption. This new pent-up demand for retail imports, combined with the increased volumes of cargoes to respond to COVID-19, generated a cargo boom.”).

[51] *Id.* at 7 (“Massive workforce disruptions due to COVID-19 in North America affected not only ports, but distribution centers, railroad intermodal facilities and warehouses across the country, as well as inland rail and truck transport lines. Without adequate staffing, containers started to pile up.”).

and trips that individual containers could complete, effectively constraining available container supply.[52] Container turnaround times increased substantially during the pandemic.[53] As containers remained tied up in congested transportation networks for longer periods, the effective supply of available containers diminished even as demand continued to rise.

79. The availability of standard dry shipping containers became a critical factor affecting the movement of goods in domestic and international commerce. Businesses throughout the United States depended upon adequate supplies of containers to transport products, maintain inventory levels, fulfill customer demand, and participate in global trade.

80. Shortages of shipping containers were a significant contributor to supply-chain disruptions during the pandemic. Reduced container availability increased transportation costs, delayed shipments, and created additional strain on businesses dependent upon international freight transportation.

81. The market conditions created by the pandemic substantially increased the economic significance of container manufacturing output. Under competitive conditions, rising demand and increasing prices would ordinarily incentivize manufacturers to expand production, increase capacity utilization, and compete aggressively to supply additional containers to the market.

82. Instead, as demand for containers increased and container availability became increasingly important to global commerce, Defendants and their Co-Conspirators restricted output, constrained supply, and deprived purchasers of the benefits of competition.[54] As alleged below, Defendants exploited these extraordinary market conditions to implement and profit from their unlawful conspiracy.

---

[52] *Id.* ("The delays in transit meant that container utilization went from 10-12 round trips across the Pacific to 3-5 round trips, which in turn means reduction in the availability of containers and market constriction.")

[53] *Id.*

[54] *Id.* at 5 ("Chassis shortages and the inability to reposition chassis to highly leveraged gateways early during prolonged cargo surges were an indicator that operation practices within the U.S. were not sustainable. This was followed by a limited flow of the manufacture of maritime containers, caused in part by the market manipulation of Chinese container manufacturers who jointly decided to reduce production.").

**D. Defendants and Their Co-Conspirators Entered into An Illegal Agreement to Restrict Output and Fix Prices of Dry Shipping Containers**

83. By at least early 2019, Defendants and their Co-Conspirators were operating within an industry characterized by extraordinary concentration, substantial barriers to entry, and frequent interaction among a small group of dominant manufacturers. These market conditions provided Defendants with opportunities to coordinate their conduct and collectively influence the supply and pricing of standard dry shipping containers.

84. At least as early as March 2019, several of the conspirators began discussing a scheme to restrict output and fix prices for standard dry shipping containers.[55] These discussions occurred among senior executives and representatives of two Defendants and one Co-Conspirator and focused on reducing competition among manufacturers that collectively controlled the overwhelming majority of worldwide container production.

85. By late 2019, Defendants and their Co-Conspirators had reached an agreement to coordinate output and pricing decisions.[56] Rather than independently determining production and pricing levels based upon customer demand and competitive market conditions, Defendants agreed to collectively manage and restrict the supply of standard dry shipping containers available to purchasers and to fix prices.

86. On or about November 14, 2019, senior executives from CIMC, Dong Fang, CXIC, and a co-conspirator manufacturer met at CIMC's headquarters in Shenzhen, China; during that meeting, participants discussed and agreed upon measures designed to restrict production and reduce competitive pressures among container manufacturers, along with fixing prices.[57]

87. Among other things, Defendants and their Co-Conspirators agreed to limit manufacturing output by restricting the number of shifts and operating hours devoted to container production.[58] By reducing productive capacity and limiting the number of containers manufactured, Defendants sought to constrain supply and prevent competitive increases in output.

---

[55] *Supra*, note 15, ¶ 23.
[56] *Id.* ¶ 24.
[57] *Id.*
[58] *Id.* ¶ 24(a).

88. Defendants and their Co-Conspirators further agreed to adopt measures intended to control production levels across participating manufacturers.[59] Rather than competing to increase sales and gain market share, Defendants coordinated production decisions for the purpose of reducing output and stabilizing industry-wide supply, leading to elevated prices.

89. Defendants also agreed to discourage the expansion of manufacturing capacity that might undermine the effectiveness of their scheme.[60] By limiting output and restraining capacity expansion, Defendants reduced the likelihood that increased production would place downward pressure on prices.

90. The goal of the agreement was to raise the price of standard dry shipping containers.[61]

91. The agreement effectively suppressed competition among container manufacturers and replaced independent business judgment with coordinated action. Under normal competitive conditions, manufacturers would be expected to increase output in response to demand and compete aggressively for customers. Defendants instead agreed to coordinate their conduct in order to restrict supply and increase prices.

92. Defendants understood that restricting output would increase the prices paid by purchasers of standard dry shipping containers. Because Defendants and their Co-Conspirators collectively controlled approximately ninety-five percent of worldwide production capacity, coordinated reductions in output and the fixing of prices were capable of significantly affecting market prices and container availability.

93. Defendants' agreement was not a legitimate collaboration or joint venture. Rather, it was a horizontal agreement among competing manufacturers to restrict output, fix prices, and eliminate competition with respect to the manufacture and sale of standard dry shipping containers.

94. Through these agreements, Defendants and their Co-Conspirators embarked upon a coordinated scheme to restrict supply, raise prices, and maximize profits at the expense of purchasers. As described below, Defendants subsequently implemented mechanisms to monitor compliance, enforce production restrictions, and ensure adherence to the conspiracy.

---

[59] *Id.* ¶ 24(b).
[60] *Id.* ¶ 24(c).
[61] *Id.* ¶ 24.

**E. Defendants Implemented, Monitored, and Enforced the Conspiracy**

95. Following their agreement to restrict output and fix prices, Defendants and their Co-Conspirators implemented a series of measures designed to ensure compliance with the conspiracy and prevent participating manufacturers from increasing production in pursuit of additional sales or market share.

96. Defendants understood that restricting output would be effective only if participating manufacturers adhered to agreed-upon production limitations. Accordingly, Defendants and their Co-Conspirators developed mechanisms to monitor production activity, exchange information concerning manufacturing output and prices, and identify (and punish) deviations from agreed-upon restrictions.

97. As part of the conspiracy, Defendants and their Co-Conspirators agreed to monitor production lines used to manufacture standard dry shipping containers. At a November 14, 2019 meeting at CIMC's headquarters in Shenzhen, representatives of CIMC, Dong Fang, CXIC, and another co-conspirator agreed to restrict output by, among other things, limiting "the number of shifts and hours that each production line for standard dry containers could run per day" and implementing surveillance measures designed to verify compliance with those restrictions.[62]

98. Among other measures, Defendants and their Co-Conspirators agreed to install video surveillance systems on container production lines and to permit participating manufacturers to access and review footage from those systems.[63] Specifically, participants agreed to install "video surveillance on all dry container production lines to ensure that the companies did not exceed the agreed-upon limitations."[64] During a subsequent December 2019 meeting attended by representatives of Defendants and other Co-Conspirators, participants again discussed installing "CCTV . . . in all production lines" and using those systems to monitor adherence to agreed-upon output restrictions.[65] In furtherance of the conspiracy, approximately 87 surveillance cameras were ultimately installed on 49 container-production lines operated by participating manufacturers.[66]

---

[62] *Id.* ¶¶ 24(a), (b).
[63] *Id.* ¶ 24(b).
[64] *Id.*
[65] *Id.* ¶ 27.
[66] *Id.* ¶ 33.

99. The surveillance systems were actively used to monitor compliance with the conspiracy. For example, in or around June 2021, executives of CIMC updated each other on their conspirers' adherence; the update included an audit of participating manufacturers' production lines that included screenshots taken directly from surveillance footage of a co-conspirator's factory.[67] Through these audits and related communications, Defendants and their Co-Conspirators monitored production levels, compared manufacturing activity among competitors, and identified potential deviations from agreed-upon restrictions and price levels.

100. Participants in the conspiracy communicated through meetings, electronic communications, and other channels to discuss production levels, market conditions, and implementation of agreed-upon restrictions. Defendants and their Co-Conspirators created a dedicated WeChat group and maintained lists of designated contacts at each participating company to facilitate communications concerning output restrictions.[68] Participants also expressed a preference for discussing sensitive matters in person in order "to avoid the suspicion of industry monopoly," and regularly met to discuss output-control measures and compliance with the conspiracy.[69]

101. Defendants and their Co-Conspirators further adopted mechanisms designed to discourage deviations from the conspiracy. During the December 2019 meeting at Dong Fang's Shanghai office, participants agreed that each manufacturer would submit a deposit that would be forfeited "[i]f any factory break [sic] the agreement."[70] Participants also agreed to build "[n]o additional new production line[s]" and to continue limiting the number of shifts and operating hours on existing production lines.[71]

102. Through this arrangement, participants established financial incentives and disincentives intended to promote adherence to agreed-upon production limitations and discourage conduct inconsistent with the objectives of the conspiracy. By February 2020, CIMC circulated a

[67] *Id.* ¶ 34.
[68] *Id.* ¶ 35.
[69] *Id.* ¶ 36.
[70] *Id.* ¶ 27.
[71] *Id.*

draft document – the Moon Gazing Fund – which illustrated aspects of the price-fixing conspiracy and established a mechanism for enforcing compliance among participating manufacturers.[72]

103. The Moon Gazing Fund operated as a mechanism through which participants could penalize manufacturers that exceeded agreed-upon production levels or otherwise deviated from the conspiracy. As originally agreed during the November 14, 2019 meeting, the fund incorporated a mechanism designed to "penalize financially any cheating on the output-restriction agreement."[73] Participants subsequently finalized the Moon Gazing Fund during a ceremony held in or around March 2020.[74]

104. Defendants and their Co-Conspirators monitored industry production levels and manufacturing activity on an ongoing basis. As the conspiracy evolved, participants refined their output-restriction mechanisms.[75] By September 2020, participants agreed to restrict the number of containers manufactured for designated "mainstream customers" and "mainstream clients."[76] Participants also agreed to cap total production volume and circulated "Total Allowable capacity" and "allowable quota" figures identifying permissible production levels for each participating manufacturer and its factory lines.[77]

105. Defendants and their Co-Conspirators also monitored competitive threats from manufacturers outside the conspiracy. Beginning no later than 2020, participants exchanged information regarding smaller container manufacturers, tracked their output and customers, and coordinated responses designed to prevent those firms from undermining cartel pricing.[78] In August 2023, conspirators discussed waging "war" against smaller manufacturers and advocated "strik[ing] back" through a price war intended to signal that those manufacturers should not "grab the orders in low price" and thereby "violate[] the effort to stabilize the price."[79]

---

[72] *Id.* ¶ 28.
[73] *Id.* ¶ 24(d).
[74] *Id.* ¶ 29.
[75] *Id.* ¶ 30.
[76] *Id.*
[77] *Id.* ¶ 31.
[78] *Id.* ¶ 38.
[79] *Id.* ¶ 39.

106. The existence of these sophisticated monitoring and enforcement mechanisms - including production-line surveillance, compliance audits, dedicated communications channels, production quotas, financial penalties, and coordinated action against non-participating competitors - demonstrates that Defendants' conduct was not the result of independent business judgment or parallel responses to market conditions. Indeed, the foregoing conduct is class cartel conduct. Defendants and their Co-Conspirators actively coordinated, monitored, and enforced compliance with a common scheme to restrict output and increase prices.

### F. Defendants Concealed Their Unlawful Conduct

107. Defendants and their Co-Conspirators understood that agreements among competitors to restrict output and fix prices violated antitrust laws and exposed participants to substantial civil and criminal liability. Accordingly, Defendants undertook efforts to conceal the existence, operation, and objectives of the conspiracy.

108. Participants in the conspiracy frequently discussed sensitive competitive matters through in-person meetings and other communications designed to minimize the creation of discoverable records. Defendants and their Co-Conspirators expressly preferred discussing output restrictions and related matters in person in order "to avoid the suspicion of industry monopoly."[80] By conducting discussions outside ordinary business channels, Defendants sought to reduce the likelihood that their unlawful activities would be detected by customers, regulators, or law enforcement authorities.

109. Defendants and their Co-Conspirators also took steps to avoid the use of terminology that might reveal the anticompetitive nature of their conduct. For example, in October 2021, while reviewing a presentation for Singamas' board of directors, a co-conspirator instructed that a reference to a "[m]anufacturing sector official and unofficial association/alliance" be removed because "alliance" was "quite sensitive under antitrust law."[81] Similarly, in March 2022, a co-conspirator reviewing a draft investor presentation advised that references to "market discipline" should not appear in presentation materials because of "anti-trust issue[s]."[82]

---

[80] *Id.* ¶ 36.
[81] *Id.* ¶ 48(b).
[82] *Id.* ¶ 48(d).

110. Defendants and their Co-Conspirators further concealed the conspiracy by limiting dissemination of information regarding their agreements and restricting access to relevant documents. In February 2023, a Singamas executive explained that the principal container manufacturers had "jointly signed an agreement on the healthy and sustainable development of the industry," but that "the specific content of the agreement was kept confidential at a very high level and could not be found out."[83] The Co-Conspirator further stated that the agreement "should currently be kept at the Head Office."[84]

111. Defendants and their Co-Conspirators also took steps to destroy, delete, or avoid creating records relating to certain aspects of the conspiracy. For example, following a December 2019 report concerning a meeting of Defendants and other Co-Conspirators, a co-conspirator observed that "[t]he discussion appeared to be anti-competition to me" and stated, "I feel very uneasy reading your report. May be [*sic*] we should delete this string of emails after reading?"[85] Another participant agreed, responding, "Yes I feel the same."[86] Such conduct was intended to hinder the ability of regulators, customers, and law enforcement authorities to uncover evidence of unlawful coordination.

112. Defendants and their Co-Conspirators' efforts to conceal their conduct reflected their awareness that their agreements were unlawful. In March 2022, a CIMC executive circulated comments from a then-United States Federal Maritime Commissioner stating that Chinese container manufacturers had "clearly took steps together to suppress the market" and had "used their market power to control the market."[87] Rather than disputing those accusations, CIMC Chairman Boliang Mai instructed his Co-Defendants and Co-Conspirators to pay close attention but neither respond nor discuss the matter.[88]

113. Defendants and their Co-Conspirators were also aware that their conduct exposed them to substantial civil liability. During a March 2023 meeting, a Singamas executive raised the

[83] *Id.* ¶ 48(e).
[84] *Id.*
[85] *Id.* ¶ 48(a).
[86] *Id.*
[87] *Id.* ¶ 48(c).
[88] *Id.*

concern about "Anti-Trust violations" and expressed concern that participants faced "a risk of being sued by clients."[89] Despite these concerns, Defendants continued to participate in and conceal the conspiracy.

114. Defendants' concealment efforts were successful for a substantial period of time. Plaintiff and members of the Class did not know, and through the exercise of reasonable diligence could not have known, of the conspiracy or Defendants' unlawful conduct until governmental investigations, criminal charges, and related disclosures revealed the existence of the cartel.

### G. Defendants' Conspiracy Artificially Increased Container Prices and Generated Extraordinary Profits

115. Defendants anticipated that restricting output would result in higher container prices. On or about December 13, 2019, shortly after the conspiracy was formed, CIMC Chairman Boliang Mai emailed subordinates predicting that the price of a standard twenty-foot dry shipping container would rise to more than $2,000 and instructed recipients not to forward the email.[90]

116. As a direct and foreseeable consequence of Defendants' conduct, prices for standard dry shipping containers increased dramatically during the Class Period. Between 2019 and 2021, the price of a standard twenty-foot dry shipping container increased from approximately $1,600 to more than $3,500, while the price of a standard forty-foot dry shipping container increased from approximately $2,800 to more than $5,900.[91] The price of a standard forty-foot high-cube container likewise increased from approximately $3,000 to more than $6,000.[92]

117. These substantial price increases occurred while Defendants and their Co-Conspirators collectively controlled approximately ninety-five percent of worldwide container manufacturing capacity and were implementing the output restrictions described herein. The timing and magnitude of the increases are consistent with the successful operation of a coordinated output-restriction and price-fixing conspiracy.

---

[89] *Id.* ¶ 48(f).
[90] *Id.* ¶ 43.
[91] *Id.* ¶ 44.
[92] *Id.* ¶ 44.

118. Defendants' conduct enabled them to obtain revenues and profits substantially greater than those that would have been earned in a competitive marketplace. CIMC's container-manufacturing profits increased from approximately $19.8 million in 2019 to approximately $1.75 billion in 2021, while Singamas improved from a net loss of approximately $110 million in 2019 to profits of approximately $186.8 million in 2021.[93]

119. Participants in the conspiracy themselves attributed these financial results to coordinated conduct. In April 2021, a Singamas executive reported that, given "strong demand, container shortage, plus strict discipline in pricing and working hours," he believed that "all container factories have significant increase in sales revenue and profit."[94]

120. The substantial increase in container prices and profitability is consistent with the operation of a successful cartel and inconsistent with competition among manufacturers. Plaintiff and members of the proposed Class directly purchased standard dry shipping containers from Defendants and their Co-Conspirators during the Class Period and paid artificially inflated and supracompetitive prices as a result of Defendants' unlawful conduct.

121. The anticompetitive effects of Defendants' conduct were reasonably foreseeable and directly resulted from the conspiracy's objective of restricting supply and increasing prices. The injuries suffered by Plaintiff and members of the Class were the precise type of harm that Defendants intended to cause and that the antitrust laws are designed to prevent.

### H. Government Investigation and Criminal Proceedings

122. As referenced *supra* ¶ 13, Defendants' conduct has been the subject of a criminal investigation by the DOJ.

123. In October 2025, a federal grand jury sitting in the United States District Court for the Northern District of California returned an indictment charging Defendants and certain executives employed by Defendants with felony violations of the Sherman Act arising from the same conduct alleged in this Complaint.[95]

---

[93] *Id.* ¶¶ 45, 46.
[94] *Id.* ¶ 47.
[95] *See United States of America v. China International Marine Containers (Group) Co., LTD., et al.*, No. 25-CR-0311-YGR (Oct. 10, 2025) Dkt. 1.

124. On January 22, 2026, the grand jury returned a superseding indictment, which was unsealed on May 19, 2026.[96]

125. The indictment and superseding indictment allege that Defendants and their executives participated in a conspiracy to restrict output and fix prices for standard dry shipping containers sold in the United States.[97]

126. The criminal proceedings concern the same market, products, and course of conduct challenged in this action.[98]

**I. Relevant Distribution Chain**

127. Dry shipping containers are identifiable, discrete physical products that remain unchanged when Defendants and Co-Conspirators sell them to direct purchasers, including Plaintiff. As a result, dry shipping containers follow a traceable physical chain of distribution from the Defendants to Plaintiff and the members of the Class. The overcharge on dry shipping containers can be traced through the chain of distribution to Plaintiff and the members of the Class (*i.e.*, from Defendants directly to direct purchasers).

**J. Potential Damages**

128. By reason of the violations of the antitrust law alleged herein, Plaintiff and the members of the Class have sustained injury to their businesses or property, having paid higher prices for dry shipping containers than they would have paid in the absence of Defendants and their Co-Conspirators' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. The alleged conspiracy affected over $35 billion in commerce globally during the Class Period and, on Plaintiff's research and investigation, approximately 40 percent of that amount affected United States commerce. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## V. STATUTES OF LIMITATIONS

129. Plaintiff and the Class's claims are not barred by any applicable statute of limitations. Throughout the Class Period and thereafter, Defendants and their Co-Conspirators actively

---

[96] *Id.* at Dkt. No. 10.
[97] *Id.* Dkt. Nos. 1, 10.
[98] *Id.*

concealed their unlawful conspiracy to restrict output, suppress competition, and fix, raise, stabilize, and maintain prices for standard dry shipping containers.

130. The conspiracy was inherently self-concealing. Defendants conducted collusive communications through private meetings, text messages, telephone calls, and other non-public channels and took steps to conceal the existence and operation of the conspiracy from purchasers, regulators, and the public.

131. Plaintiff and members of the Class did not know, and could not reasonably have known, of Defendants' unlawful conduct until the DOJ unsealed its criminal indictment in May 2026. The indictment disclosed for the first time the existence of the conspiracy, the identities of the participants, and the mechanisms used to implement and enforce the scheme.

132. Prior to the government's investigation and public disclosures, Defendants' conduct appeared consistent with lawful business activity occurring during a period of extraordinary market disruption associated with the COVID-19 pandemic and global supply-chain conditions. Plaintiff therefore could not reasonably have discovered the conspiracy through the exercise of due diligence.

133. Accordingly, the running of any applicable statute of limitations was tolled during the period of Defendants' concealment, and Plaintiff's claims are timely.

## VI. CLASS ALLEGATIONS

134. Plaintiff brings this Action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and (b)(3), seeking equitable and injunctive relief, and other relief pursuant to federal antitrust laws on behalf of the following Classes:

> All persons and entities in the United States and its territories that directly purchased standard dry shipping containers from any Defendant or Co-Conspirator during the period from November 1, 2019 through January 31, 2024 (the "Class Period").
>
> Excluded from the Class are Defendants, their parent companies, subsidiaries, affiliates, officers, directors, management, employees, agents, and all federal governmental entities.

135. Plaintiff reserves the right to amend, modify, or refine the Class definition and proposed Class Period based upon discovery, further investigation, rulings of the Court, or developments in the litigation.

136. The members of the Class are so numerous that joinder of all members is impracticable. Defendants and their Co-Conspirators sold substantial quantities of standard dry shipping containers throughout the United States during the Class Period. The precise number of Class members is presently unknown but can be ascertained through Defendants' records and discovery.

137. Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all members of the Class. Such common questions include, but are not limited to:

a. Whether Defendants and their Co-Conspirators engaged in a conspiracy to restrict output, suppress competition, and fix, raise, stabilize, and maintain prices for standard dry shipping containers;

b. The identity of the participants in the conspiracy;

c. The duration, scope, and objectives of the conspiracy and the acts carried out in furtherance thereof;

d. Whether Defendants' conduct violated Section 1 of the Sherman Act;

e. Whether Defendants' conduct caused prices for standard dry shipping containers to be artificially inflated during the Class Period;

f. Whether Defendants' conduct caused injury to the business or property of Plaintiff and the Class;

g. The effect of Defendants' conduct on the prices paid by direct purchasers of standard dry shipping containers; and

h. The appropriate relief for the Class, including damages and equitable relief.

138. Plaintiff's claims are typical of the claims of the members of the Class, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class were similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for standard dry shipping containers purchased directly from Defendants and/or their Co-Conspirators.

139. Plaintiff's claims arise from the same course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are aligned with those of the Class, and Plaintiff is represented by counsel experienced in the prosecution of antitrust and complex class actions.

140. Questions of law and fact common to the Class predominate over any questions affecting only individual members, including issues relating to liability, antitrust impact, and damages.

141. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class treatment will permit similarly situated purchasers to litigate their common claims in a single forum, avoid inconsistent adjudications, and conserve judicial and party resources.

142. Defendants' conduct was generally applicable to the Class as a whole. Proof of the conspiracy, its implementation, anticompetitive effects, and resulting damages will be established through common evidence, including Defendants' records, communications, transactional data, economic analyses, expert testimony, and evidence developed through governmental investigations.

## VII. <u>CLAIMS FOR RELIEF</u>

### FIRST CLAIM FOR RELIEF
### Violation of Section 1 of the Sherman Act
### 15 U.S.C. § 1

143. Plaintiff incorporates by reference and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

144. During the Class Period, Defendants and their Co-Conspirators entered into, participated in, facilitated, maintained, monitored, and enforced a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

145. Defendants and their Co-Conspirators agreed to restrict output, limit production capacity, fix, raise, stabilize, and maintain prices, and otherwise suppress competition in the manufacture and sale of standard dry shipping containers sold throughout the United States and worldwide.

146. The conspiracy alleged herein constituted a *per se* unlawful restraint of trade under Section 1 of the Sherman Act. Defendants' agreements to restrict output and fix prices eliminated competition among horizontal competitors and replaced independent business judgment with coordinated conduct.

147. Defendants' unlawful conduct had direct, substantial, and reasonably foreseeable effects on interstate and foreign commerce. Defendants manufactured, marketed, distributed, sold, and delivered substantial quantities of standard dry shipping containers for use in United States commerce and derived substantial revenues therefrom.

148. The conspiracy substantially restrained competition in the market for standard dry shipping containers. As a result of Defendants' conduct, output was artificially restricted, prices were artificially inflated, and purchasers were deprived of the benefits of a competitive marketplace.

149. Plaintiff and members of the Class directly purchased standard dry shipping containers from Defendants or their Co-Conspirators during the Class Period and paid more for those containers than they would have paid in the absence of Defendants' unlawful conduct.

150. Plaintiff and members of the Class suffered antitrust injury of the type the antitrust laws were intended to prevent and that flows directly from that which makes Defendants' conduct unlawful. The injury suffered by Plaintiff and the Class resulted from the reduction of competition caused by Defendants' conspiracy.

151. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have sustained damages in an amount to be determined at trial, together with pre-judgment and post-judgment interest as permitted by law. Pursuant to Section 4 of the Clayton Act, Plaintiff and the Class are entitled to recover threefold the damages sustained, as well as the costs of suit and reasonable attorneys' fees.

152. Plaintiff and the Class are also entitled to equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain Defendants' continuing violations of the antitrust laws and to eliminate the effects of Defendants' unlawful conduct.

## VIII. PRAYER FOR RELIEF

153. WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court enter judgment in its favor and against Defendants as follows:

a. Determining that this action may be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3);

b. Certifying the Class, appointing Plaintiff as Class Representative, appointing Plaintiff's counsel as Class Counsel, and directing that notice of this action be provided to Class members pursuant to Federal Rule of Civil Procedure 23(c)(2);

c. Adjudging and decreeing that Defendants' conduct, as alleged herein, violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

d. Awarding Plaintiff and the Class treble damages in an amount to be determined at trial, together with pre-judgment and post-judgment interest as permitted by law;

e. Awarding Plaintiff and the Class their costs of suit, including reasonable attorneys' fees, litigation expenses, and expert costs to the fullest extent permitted by law;

f. Awarding equitable, declaratory, and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, sufficient to prevent and restrain Defendants from continuing, maintaining, or renewing the unlawful conduct alleged herein and to eliminate the effects of Defendants' anticompetitive conduct;

g. Awarding Plaintiff and the Class such other and further relief as the Court deems just and proper.

## IX. JURY DEMAND

154. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all matters so triable.

Dated: June 24, 2026

Respectfully submitted,

/s/ Adam J. Zapala
Joseph W. Cotchett (SBN 36324)
Adam J. Zapala (SBN 245748)
Elizabeth T. Castillo (SBN 280502)
Christian S. Ruano (SBN 352012)
Lauren Devens (SBN 364511)
**COTCHETT, PITRE & McCARTHY LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
jcotchett@cpmlegal.com
azapala@cpmlegal.com
ecastillo@cpmlegal.com
cruano@cpmlegal.com
ldevens@cpmlegal.com

***Counsel for Plaintiff Atlantic Coast Container, Inc. and the Proposed Direct Purchaser Plaintiff Class***